702 So.2d 1047 (1997)
STATE of Louisiana, Plaintiff,
v.
Michael McARTHUR, Defendant-Appellant.
No. 97-597.
Court of Appeal of Louisiana, Third Circuit.
October 29, 1997.
*1048 Robert Richard Bryant, Jr., Mike K. Stratton, Lake Charles, for State.
Thomas E. Guilbeau, Lafayette, for Michael McArthur.
Before YELVERTON, COOKS and GREMILLION, JJ.
GREMILLION, Judge.
The defendant, Michael McArthur, forced the victim, Tyra Manuel, to have vaginal, anal, and oral sex with him. He was subsequently charged by bill of indictment with one count of aggravated rape, La.R.S. 14:42, one count of aggravated kidnapping, La.R.S. 14:44, and one count of aggravated crime against nature, La.R.S. 14:89.1. After trial by jury, Defendant was found guilty of one count of forcible rape, La.R.S. 14:42.1, one count of second degree kidnapping, La.R.S. 14:44.1, and one count of crime against nature, La.R.S. 14:89. The State filed a habitual offender bill against Defendant charging him as a second offender, La.R.S. 15:529.1. The bill sought the enhancement of the forcible rape conviction only. After a hearing, Defendant was adjudicated a habitual offender and sentenced to sixty years at hard labor with twenty-five years without benefit of parole. In addition, Defendant was sentenced to forty years with twenty-five being without benefit of parole for the crime of second degree kidnapping and five years for the crime against nature conviction. All sentences were ordered to run concurrently. Defendant now appeals his convictions and *1049 sentences, alleging seven assignments of error.

SUFFICIENCY OF EVIDENCE
By this assignment of error, Defendant claims the evidence was insufficient to support the verdicts rendered by the jury. Specifically, Defendant claims inconsistencies in the victim's testimony negated her credibility. Also, Defendant asserts that the evidence did not refute his defense that the sex between him and the victim was consensual in that he traded crack cocaine for sex with her.
The jury heard substantial conflicting testimony. According to the victim, Defendant flagged her down on the evening of October 19, 1993, and asked her to take him to the store. The victim claimed that Defendant kept trying to "hit a piece of dope on a car," that is smoke cocaine using a soda or cold drink can. When she asked him to stop, Defendant got upset and began hitting and cursing her. At one point, the victim stopped at Peggy's Superette where Defendant got out of the car and went into the store. She waited for him at that location. Defendant then got back in the car, and the victim drove him to an Exxon gas station. There they both got out of the car. The victim, who had possession of the car keys, went into the store to pay for the gas she purchased. She was unaware of Defendant's whereabouts, but when she got back to her car, Defendant also reentered the car. She claimed she was afraid to run away because she was scared Defendant would hit her harder and hurt her "real bad, so [she] just cooperated with him." Shortly after the gas stop, defendant took control of the car. The victim testified that Defendant forced her head in his lap, continued to hit her in the face, and threatened her with a knife which she said she never saw.
According to the victim, Defendant drove to a spot, dragged her out of the car, and forced her to perform oral sex on him by hitting her and threatening to kill her. They drove to another location where Defendant tried to smoke crack again and insisted on having sex with the victim again, threatening to slice her throat with the knife. She testified that Defendant tied her hands to the steering wheel with a clothes hanger he found underneath the seat. While at this second location, Defendant removed the tire tool from the trunk, although the victim stated that he never threatened her with it. However, he again forced the victim to perform oral sex on him by continuing to strike and curse her. After the oral sex, Defendant forced her to have vaginal and anal sex with him which she submitted to because, in her words, "I went on with it, just to keep my life going, because I didn't want him to fight me no more, and I went on with whatever he was asking for me to do."
The victim testified that after she promised not to tell anyone, Defendant left on foot. She said she went straight to her mother's house and told her mother and Barbara Guillory what had happened. They then went to the Sheriff's substation which was located across the street from her mother's house and from there to the hospital. She further claimed on direct examination that she neither used drugs the day of the incident nor when she was with Defendant. She denied that she performed any of the sex acts in exchange for drugs.
The victim's mother, Jane Conway, and Guillory both testified that when the victim came home that night she was beaten and crying. According to the witnesses, her face was bruised and bleeding. Ms. Conway stated that her car had grass and leaves all over it and the driver's side door was hanging. The victim told them that she had been raped by Defendant. Conway went with the victim to the police station and the hospital. At the emergency room, the victim was administered to by an emergency room nurse, Karen Whitehead. The victim told her that she had been raped. Whitehead stated that the victim had swelling on her right cheek and a scratch on one of her thighs.
On cross-examination, numerous inconsistencies in the victim's testimony were brought out; however, she never recanted the essence of her testimony, that Defendant forced himself upon her. Defendant testified that while he had sex with the victim on the night in question, he did not rape her. It was his testimony that he gave the victim *1050 drugs in exchange for sex and that the sex was consensual. He denied beating her, threatening her, or having anal sex with her. Other witnesses testified on behalf of Defendant, stating that they saw Defendant and the victim together not only on the night in question but on several occasions before that night and that they sold drugs to the victim and Defendant in the weeks and months preceding this event.
Although the victim's testimony contains several inconsistencies and witnesses testified that she was with Defendant on more than one occasion before the night in question, the victim's testimony, coupled with the physical evidence, was sufficient to support the jury's verdicts. The jury heard Defendant's claim that the victim traded drugs for sex and apparently chose to disbelieve him.
In State v. Pontiff, 604 So.2d 71, 76 (La. App. 3 Cir.1992), this court stated the following with respect to a jury's credibility determination:
The jury, sitting as the trier of fact, had the distinct opportunity to view each individual witness's demeanor, listen to their respective testimony, and assess credibility. Their firsthand knowledge of the witness's testimony is an immeasurable advantage when compared to our limited review within the four corners of the cold record.... Since the record fully supports the jury findings, this court will not engage in reevaluating the credibility of witnesses and reweighing the other evidence adduced at trial.
As in Pontiff, the record in the case sub judice supports the jury's verdicts. The jury, when faced with two plausible stories, chose to believe one and disregard the other. Such is the province of the jury. When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983). We will not second guess the credibility determination of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. See State ex rel. Graffagnino, 436 So.2d at 563, citing State v. Richardson, 425 So.2d 1228 (La.1983). We, therefore, cannot find that the jury abused its discretion in finding that the evidence was sufficient to convict the Defendant. This assignment of error is without merit.

MOTION TO DISQUALIFY THE ASSISTANT DISTRICT ATTORNEY
In this assignment of error, Defendant claims the trial court erred in denying his Motion to Disqualify the Assistant District Attorney due to recent publicity concerning her election as judge. Defendant filed this motion on October 16, 1996, and it was denied after a hearing on October 21, 1996. This issue was addressed by this court in a pre-trial writ application filed on October 21, 1996. This court denied the writ, finding no error in the trial court's ruling. State v. McArthur, an unpublished writ bearing docket number 96-1432 (La.App. 3 Cir. 10/21/96), writ denied, 96-2531 (La.10/22/96); 681 So.2d 347.
The prior denial of supervisory writs does not bar reconsideration of an issue on appeal, nor does it prevent the appellate panel from reaching a different conclusion. State v. Fontenot, 550 So.2d 179 (La.1989); State v. Decuir, 599 So.2d 358 (La.App. 3rd Cir.1992), writ denied, 605 So.2d 1095 (La. 1992). When a defendant does not present any additional evidence on this issue after the pre-trial ruling, the issue can be rejected on appeal. See, e.g., State v. Regan, 601 So.2d 5 (La.App. 3rd Cir.1992), writ denied, 610 So.2d 815 (La.1993); State v. Wright, 564 So.2d 1269 (La.App. 4th Cir. 1989). Judicial efficiency demands that this court accord great deference to its pre-trial decision unless it is apparent that the determination was patently erroneous and produced unjust results. State v. Decuir, supra, at 360.
State v. Magee, 93-643 (La.App. 3 Cir. 10/5/94); 643 So.2d 497, 499.
Defendant has not presented any additional evidence on appeal other than the fact that *1051 the jurors selected in the case either previously knew of Assistant District Attorney Minaldi's election or were informed by the court of the election in its preliminary questioning of each juror. However, each juror was asked if that knowledge would affect his or her decision-making in the case, and each responded that it would not. Defendant, as well as the State, was given an opportunity to question each juror on that point, and each juror indicated that the information would not affect their decision. In his brief, Defendant argues the Assistant District Attorney's election as judge created a chilling effect on Defendant's legal representation at trial. However, Defendant points to nothing that indicates his legal representation was chilled.
Defendant has not directed this court to any case in which an assistant district attorney's election as a district judge affected the district attorney's office to the point of requiring a recusal under La.Code Crim.P. art. 680(1). That article provides for the recusal of a district attorney when he "[h]as a personal interest in the cause or grand jury proceeding which is in conflict with fair and impartial administration of justice[.]" The burden of proving a personal interest under Article 680(1) rests with the defendant, who must prove it by a preponderance of the evidence. State v. Bourque, 622 So.2d 198 (La.1993). Because Defendant has not presented any additional evidence on appeal as to any prejudice suffered because of Assistant District Attorney Minaldi's election as judge, we shall follow our pre-trial ruling and find this assignment of error lacks merit.

OTHER CRIMES EVIDENCE
Defendant claims the trial court erred in admitting other crimes evidence involving previous sexual assaults by Defendant. A hearing on the admissibility of the evidence was held prior to the trial in response to Defendant's motion to exclude the evidence. We note Defendant sought pretrial supervisory review of the admissibility of this evidence. In State v. McArthur, an unpublished writ bearing docket number 96-847 (La.App. 3 Cir. 8/7/96), writ denied, 96-2237 (La.11/15/96); 682 So.2d 772, this court denied the writ, stating:
The other crimes evidence is admissible at this time. State v. Crawford, 95-1352 (La. App. 3 Cir. 4/3/96); 672 So.2d 197. However, the admissibility of the other crimes evidence is subject to later review at trial on the merits. La.Code Evid.arts. 404(B) and 1104; see also, Huddleston v. U.S., 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988).
Because we found the admissibility of the other crimes evidence was subject to later review at the trial on the merits and because of our decision in Magee, 643 So.2d 497, we will address the merits of this assignment. The evidence sought to be introduced by the State consisted of the testimony of three witnesses, Nonie Lofton, Julie Ann DeBarge, and Bobby Molitor. Because Defendant was found not guilty of the sexual battery against DeBarge, the trial court excluded the introduction of that evidence. However, the trial court found the testimony of Lofton and Molitar admissible. Before the prior acts were introduced at trial, the Defendant again objected to the introduction of the testimony. At that point, the trial court found a proper foundation had been laid and admitted the testimony.[1] Lofton *1052 testified at trial that Defendant attempted to rape her while on a date in 1978, when both were attending McNeese State University. Molitar testified that Defendant attempted to anally rape him while the two were incarcerated in 1994. On appeal, Defendant claims this evidence should not have been admitted because the prior acts were dissimilar, the probative value of the acts outweighed their prejudicial effect, and the prior acts were too remote in time.
In State v. Crawford, 95-1352 (La.App. 3 Cir. 4/3/96); 672 So.2d 197, 209, writ denied, 96-1126 (La.10/4/96); 679 So.2d 1379, we held the following with respect to the introduction of other sexual crimes:
"Generally, evidence of other sex crimes committed by the accused against the same victim or a similarly situated victim falls into one of the LSA-C.E. Art. 404(B) exceptions. [State v.] Tolliver, [621 So.2d 17 (La.App. 2 Cir.1993)]." State v. Allen, 26,547 (La.App. 2 Cir. 12/7/94); 647 So.2d 428, 434, writ denied, 95-0048 (La.5/19/95); 654 So.2d 1352. In State v. Showers, 359 So.2d 104 (La.1978), the court noted:
It is true that his court has held to be admissible, for limited purposes, proof of other crimes exhibiting almost the identical modus operandi or system, committed in close proximity in time and place. State v. Jones, 332 So.2d 466 (La.1976) (a pre-Prieur trial); State v. Price, 325 So.2d 780 (La.1976); State v. Vince, 305 So.2d 916 (La.1974); State v. Lawrence, 294 So.2d 476 (La.1974).
However, as the jurisprudence has clarified, the other crime must be distinctively similar in system, State v. Slayton, 338 So.2d 694 (La.1976); State v. Waddles, 336 So.2d 810 (La.1976); State v. Hicks, 301 So.2d 357 (La.1974) I.e., "so peculiarly distinctive that one must logically say that they (the two crimes) are the work of the same person," State v. Lee, 340 So.2d 1339, 1345 (concurring opinion of Mr. Justice Dennis) (La.1976). Furthermore, the proof of the other crime as part of the system must be relevant to prove a fact of consequence to the accused's present innocence or guilt (not including the inadmissible purpose to infer that the accused committed the present crime because he had committed the other one). State v. Ledet, 345 So.2d 474 (La.1977); State v. Frederick, 340 So.2d 1353 (La.1976); State v. Gaines, 340 So.2d 1294 (La.1977); State v. Hicks, 301 So.2d 357 (La.1974); State v. Harrison, 291 So.2d 782 (La.1974).
In Crawford, we found the prior sex offenses sought to be introduced were not so similar as to produce a distinct modus operandi, but found the evidence was properly admitted because it showed "a pattern and intent or `lustful disposition' on defendant's part to force women, with either a knife or through strangulation and brute force, to engage in nonconsensual sex." Id. at 210. In Crawford, the defendant used force in all of his sexual assaults. He wielded a knife on three of his victims, strangled and dragged two, and pulled two by their hair. Finally, the court in Crawford found the prior sex offenses were relevant to show motive and intent.
When ruling on the admissibility of the prior sex offenses at issue in the present case, the trial court, in the Prieur hearing, stated:
The three offenses all involve forcing another person to engage in sexual activities in order to gratify the defendant's own sexual impulse. The Lofton evidence also involves keeping someone against her will, which is an additional similarity to the offense at issue. Therefore, this court considers all three incidents to be similar offenses.
The trial court properly found the prior sex offenses were sufficiently similar to be admissible. Molitar testified that while incarcerated at the Calcasieu Correctional Center, Defendant told him he could help him with his case. Molitar said he was free to walk from cell to cell within a certain area of the Center. Molitar testified that he began talking to Defendant, who told him he could get him out. Molitar said he then went into Defendant's cell to discuss his case further. Molitar claimed that once in the cell, *1053 he and Defendant started talking about different things, and Defendant asked him if he could "check [him] out." According to Molitar, shortly after that, Defendant, who was bigger and stronger than him, grabbed him by his arm and leaned him against the toilet with his knee against him. It was Molitar's testimony that Defendant pulled his arm around his back and, at the same time, began pulling Molitar's pants down. Molitar testified that Defendant then took his penis out and tried to stick it into him. Molitar said he finally got loose and left the cell. According to Molitar, he noticed that Defendant was masturbating as he left and Defendant threatened to kill him if he said anything about the event.
Lofton testified that she met Defendant while attending McNeese State University. She said Defendant asked her out on a date, and they went to a movie and to eat at McDonald's. She stated that after they stopped at a couple of bars, Defendant asked her if she wanted to go dancing at the Legal Tender, which was a popular place at that time. She said, instead of going to the Legal Tender, Defendant drove on a back country road where he made a number of unwanted advances toward her. She claimed she did not want to get intimate and resisted and fought off Defendant as best she could. According to Lofton, Defendant ignored her resistance and pleas to stop and persisted until he succeeded in removing her pants and underwear. She said he eventually rolled her over on her stomach and attempted to enter her from the rear. She testified that he eventually stopped and when she turned around she noticed he was ejaculating in something like a T-shirt. She said she grabbed her pants and underwear, got out of the car, and put them back on. Lofton said that Defendant put his clothes back on, apologized to her, and finally took her back to her dormitory.
We find the above evidence was sufficiently similar to show a pattern and intent, or "lustful disposition," on Defendant's part to lure acquaintances into situations where he could force them with brute force into nonconsensual sex acts. Defendant has not shown why his assault on Molitar should not be used simply because it was a homosexual act. Furthermore, the evidence was relevant since the victim's credibility was at issue. Defendant claimed the victim consented to the sexual acts on the night in question, thus, evidence that Defendant forced two others into nonconsensual sex was relevant.
Finally, as to Defendant's claim that the two other offenses should not have been admitted because of remoteness in time, we note our ruling in Crawford, 672 So.2d at 208-209, citing State v. Jackson, 625 So.2d 146 (La.1993):
We find that the time between the other crimes evidence and the offense charged is but one factor to be considered when balancing probative value, prejudicial effect and relevancy. Length of time between the offenses should not exclude otherwise admissible evidence unless the lapse strips the testimony of probative value. While there must be some connexity between the crime charged and the other acts or crimes, the mere passage of time will not necessarily defeat admissibility. However, such a determination must be made on a case by case basis taking into account the peculiar facts of every individual case with much discretion given to the trial judge. State v. Cupit, supra [189 La. 509, 179 So. 837 (1938)]; State v. Driggers, supra [554 So.2d 720 (La.App. 2 Cir. 1989)].
Defendant has not shown that the lapse of time between the previous sexual offenses and the present offense strips the other crimes testimony of their probative value. For the foregoing reasons, we find that this assignment of error lacks merit.

RIGHT TO CONFRONT AND CROSS-EXAMINE
By this assignment of error, Defendant claims the trial court erred in failing to allow him his constitutional right of confronting and cross-examining the alleged victim on her prior use of drugs. On direct examination, the victim testified that she had used cocaine in the past but had quit by October 19, 1993, the date of the incident in question. After her testimony, the trial court addressed the question of whether or not defense *1054 counsel could examine the victim on her prior drug use. The trial court allowed the Defendant to examine the victim, outside the presence of the jury, on her use of drugs in order to determine whether or not he could cross-examine her on such use in the presence of the jury. After the examination out of the jury's presence, the trial court found insufficient foundation was laid for the Defendant to question the victim on this issue. However, the trial court stated that if Defendant presented evidence that the victim used drugs on the day in question, he would allow defense counsel to cross-examine her as to her prior drug use. Defendant objected to the trial court's ruling. After the defense rested, the trial court stated it would allow Defendant to cross-examine the victim on her prior drug use since he testified that the victim used drugs on the day in question. Defendant elected not to recall the victim for cross-examination. Thus, we hold that the trial court did not violate Defendant's constitutional right to confront his accuser.
Defendant further claims the trial court's allowance of cross-examination on this issue came too late and he was prejudiced by not being allowed to cross-examine the witness during the State's case-in-chief. Defendant cites no cases for this proposition nor does he state with any specificity how he was prejudiced. We can not, therefore, find that Defendant was prejudiced in any way by the trial court's ruling on this issue and conclude that this assignment of error also lacks merit.

EXCESSIVE SENTENCE
Defendant claims the sentences imposed by the trial court are excessive. Defendant filed a Motion to Reconsider Sentence alleging the excessiveness of the sentence. The motion was denied without a hearing.
At the sentencing hearing, Defendant was adjudicated a habitual offender, second offense. The State sought enhancement of the forcible rape conviction only. For that offense, Defendant received sixty years at hard labor with twenty-five years without benefit of parole. For the second degree kidnapping conviction, Defendant received forty years with twenty-five years without benefit of parole. Finally, on the crime against nature conviction, Defendant received five years. All the sentences were ordered to run concurrently.
The trial court stated the following when imposing sentence:
But, these factors that justify a lengthy sentence in these cases typically include whether someone has an extensive criminal record, and Mr. McArthur does, even though it's only one prior felony conviction. I have a letter from Mr. Alexander, the District Attorney in Cameron Parish, where Mr. McArthur's from, detailing matters going back to '73 of____and there's one conviction for simple battery, battery is never good, no matter what it is, and even though it is a misdemeanor, and he was sentenced to it for battery in 1983, and I won't try to____there's no point in trying to detail all this on the record, but there's other offenses in March of 1989, he stole some payroll checks from his employer, according to this information and his mother paid off the amount of $840 and then charges were dropped. There was another complaint in 1981 of a simple rape that wasn't____the offense was alleged to have occurred in Calcasieu Parish and there were no charges filed on it. And there was another incident in 1991, as recently as 1991, he was arrested after being forbidden at the complaint of his own mother, and she had talked to him about his drug problem. So he's been a problem even for his own family. '93, there was a felony theft. So,____and I'm not going to go into all of them, but even more importantly are the two offenses which were testified to in this trial and which the Court believes. The jury found Mr. McArthur guilty and that's what I'm acting on, but in addition to that, I believe the testimony of the complaining witness in this case, Miss Manuel, and I believe the testimony of the present nurse who was a former McNeese student in the late 1970's when she testified to a forcible rape of her, and I believe the testimony of the prisoner, Mr. Molitar, of the rape that occurred in the jail, so____
The trial court was made aware that those two events were not rapes but only attempts *1055 to commit rape. The trial court then continued:
Well, I misspoke. You're right. You're right. I retract that, and that's correct. I was just too loose in my statements. They were attempted rapes, which still just shows the consistent state of mind of Mr. McArthur, and I think it has been established by the case itself and by the other information in the pre-sentence investigation that Mr. McArthur is a sexual predator. Certainly by his record he's established that he's a likely recidivous and I certainly place him in the category based on this information that I'm talking about of being virtually incorrigible and probably can't be rehabilitated, but also bearing in mind my thought that I expressed, and I haven't heard anything to convince me different, that I do not see that the case is one, given the jury's verdict, that I should necessarily do something in terms of years that becomes what I call tantamount to a life sentence, although I think a very long sentence is warranted and one that will keep Mr. McArthur____society free of him for a long enough period of time to get to an advanced age that he's likely not to be a danger to anybody again. There's just a terrific amount of anger in him. I would hope that the____I put it in my sentence when I issued it to the Department of Corrections will consider some attention to some anger management and I have no way of____I can't deal with how all that came about, but it's one of the worse situations I've seen. I couldn't help but think____I remember seeing Mr. McArthur play in the late '70s, I've been going to McNeese games since they had the stadium, and I remember how much____I can see how much different this man's life could have been. He had the opportunity through his athletic ability to gain an education. He even had an opportunity later to play professional football and to have a career; but for whatever reason he embarked upon a vicious criminal career and it's so ironic that I recall that the late Jack Doland, who was his coach, used to refer to him as Super Mac, and how appalled Coach Doland would be if he were alive today to see that instead he's become a super criminal. So, given all those circumstances and also considering what I consider an outside limit that the jury has indicated by its verdict on the____and to satisfy what I think is necessary to have him incarcerated for a long enough period of time to reach a point where he would no longer be a danger....
Also, when imposing the sentence for second degree kidnapping, the trial court stated he was imposing the maximum sentence because the acts constituted multiple assaults over different locations "before the night of terror for that young woman was over."
The sentences imposed were not unconstitutionally excessive. For the forcible rape conviction, Defendant could have received eighty years rather than the sixty he received. Although Defendant received the maximum sentences for the second degree kidnapping and the crime against nature offenses, all the sentences were ordered to run concurrently. Thus, Defendant's actual term of imprisonment is only sixty years, twenty years less than the maximum possible for his forcible rape conviction as a second felony offender.
The trial court imposed twenty-five years without parole on the forcible rape and second degree kidnapping charges. Defendant cites no cases in his brief indicating such an imposition is excessive. In fact, Defendant cites no cases in his brief to indicate the length of years imposed is excessive. As noted by the trial court, Defendant has the following criminal history: 1) Offense of theft in 1972, which was nolle prossed in 1973; 2) Offense of attempted aggravated rape in 1978, which was nolle prossed in 1986; 3) Offense of forcible rape in 1978, which was nolle prossed in 1980; 4) Offense of "worthless checks" in 1979, which was nolle prossed in 1979; 5) Offense of criminal mischief in 1979, which was nolle prossed in 1980; 6) Offense of armed robbery, amended to simple robbery, for which Defendant received seven (7) years at hard labor; and 7) Parole revocation in 1992 for technical violations. The Pre-sentence Investigation Report (P.S.I.) also indicates Defendant's parole *1056 was again revoked on October 24, 1995[2] for the present offenses. Additionally, the P.S.I. notes Defendant has pending charges in Cameron Parish for armed robbery, attempted aggravated rape, false imprisonment, offender armed with a dangerous weapon, and simple criminal damage to property, all of which occurred on or about October 13, 1993.
Finally, we note Defendant's outburst that occurred during sentencing, where he cursed the trial court and other court personnel. The trial court had to stop the proceedings, remove Defendant from the courtroom, and order his mouth taped[3] before it could proceed. Further, the trial court noted after sentencing that it had received information with the P.S.I. that Defendant had made threats to kill the assistant district attorney prosecuting his case.
Article 1, § 20 of the Louisiana Constitution of 1974, prohibits, "cruel, excessive, or unusual punishment." A sentence which falls within the statutory limits may nevertheless be excessive under the circumstances. State v. Sepulvado, 367 So.2d 762 (La.1979); State v. Naquin, 527 So.2d 601 (La.App. 3 Cir.1988). To constitute an excessive sentence, this court must find that the penalty is so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and, therefore, is nothing more than a needless imposition of pain and suffering. State v. Campbell, 404 So.2d 1205 (La.1981); State v. Everett, 530 So.2d 615 (La.App. 3 Cir. 1988), writ denied, 536 So.2d 1233 (La.1989). The trial court is given wide discretion in imposing a sentence, and a sentence imposed within statutory limits will not be deemed excessive in the absence of manifest abuse of discretion. State v. Howard, 414 So.2d 1210 (La.1982).
We find that the sentences imposed were not so grossly disproportionate to the severity of the crime as to shock our sense of justice. Instead, we hold that the sentences imposed are well within the vast discretion of the trial court and makes a measurable contribution to acceptable penal goals in the instant case. Therefore, we find that the sentences are not excessive. This assignment of error lacks merit.

BATSON CHALLENGE
In this assignment of error, Defendant claims the trial court erred in granting the State's Batson challenge to Defendant's peremptory strike of prospective juror Bobby Denton. On appeal, Defendant alleges the State failed to make a prima facie showing of either gender or race discrimination. Additionally, Defendant claims he did not have the opportunity to fully explain his reasons for striking Denton.
When Defendant peremptorily challenged Denton, the State immediately raised a Batson objection asserting that the challenge was based on both gender and race. Denton gave very short answers to the very short inquiries propounded to him by Defendant. The State claimed that he gave no indication different from others who were seated as jurors and was challenged only because he was a white male. Defendant responded that the challenge was based on the fact that Denton knew the assistant district attorney had been elected judge and that he "shuns" counsel when counsel made eye contact with him. The trial court denied the challenge finding, first, that a number of the other jurors knew of the assistant district attorney's election, and second, that the "business about the eye contact and intuition, that's out." However, the trial court told Defendant he would reconsider his ruling if he later thought of some legitimate reason for the challenge.
The Louisiana Supreme Court, in State v. Green, 94-887 (La.5/22/95); 655 So.2d 272, 287 (footnotes omitted), has stated the following with respect to Batson challenges:
In Batson the Supreme Court adopted a three-step analysis to determine whether the constitutional rights of prospective jurors *1057 have been infringed by impermissible discriminatory practices:
First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.
The United States Supreme Court extended Batson to gender discrimination in J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
In order to prove a prima facie case of discrimination, the proponent of a Batson challenge "may offer any facts relevant to the question of the [opponent's] discriminatory intent to satisfy this burden." Green, 655 So.2d at 288. The court in Green further stated:
Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.
Id. [footnote and citations omitted].
Although the State did not state on the record a prima facie showing of race or gender discrimination when discussing the exclusion of Denton in particular, the State had established such a showing prior to the discussion of Denton. After unsuccessfully making a Batson objection on Defendant's challenge to prospective juror, Dave Aguillard, the State re-urged its objection based on gender. The State claimed that all of the people who had been excused, except for Theresa Thibodeaux, were men. Later in the jury selection, the trial court, in response to a Batson challenge made by Defendant, noted that Defendant had exercised six peremptory challenges, five of which were white males. When the State made its Batson challenge to the strike of Denton, it did not reiterate Defendant's previous exclusion of white males, but it did state for the record that Denton was a white male and that the answers given by him were no different than the ones given by those who remained on the jury. Given the prior statements by both the State and the trial court as to the Defendant's exclusion of white males, the State made a prima facie showing of discriminatory exclusion of jurors.
For the foregoing reasons, this assignment of error lacks merit.

CONCLUSION
The convictions and sentences of the defendant, Michael McArthur, are affirmed.
AFFIRMED.
NOTES
[1] The trial court may have been confused as to what finding was necessary before it admitted the other crimes evidence at trial. The trial court stated that it understood that the ruling at the Prieur hearing allowed the admission of evidence of other crimes and that the only thing left for it to do was to decide if the foundation evidence had been laid showing the commission of the present offense before allowing introduction of the other crimes evidence. The trial court found the foundation evidence sufficient and allowed the introduction of the Prieur evidence. Instead of determining whether a proper foundation was laid for the present offense, the trial court should have determined whether a proper foundation had been laid for the prior offenses. Also, we are of the opinion, based on our pretrial ruling, that another determination on the admissibility of the evidence should have been made at trial. Thus, the trial court should not have felt bound by the determination made by the judge, who found the evidence admissible pre-trial. Since Defendant does not allege any of these apparent errors on appeal, we have not addressed this issue. Furthermore, we note the victims of the prior offenses themselves testified at the Prieur hearing. Therefore, without any evidence that their testimony would be different at trial, it seems the trial court could have made a finding on the admissibility of the evidence based on the pre-trial hearing.
[2] The P.S.I. says the parole was revoked on October 24, 1996, in one place and October 24, 1995, in another.
[3] Because Defendant agreed not to continue the outbursts, he was allowed back in the courtroom without having his mouth taped.